This is case number 067092, Simmons v. Department of Veterans Affairs. This is a case where the government has challenged the decision below. With respect to the application of the Mayfield first element test, placing a burden on the government to establish a lack of prejudice in the event of a finding of an error in issuing, identifying what was required to pursue or present a substantial claim. So let me start with you, going, I started with Mr. Warren, to just see if I get it right. Is the government's position in this case that the tests that Mayfield applied on the second, third, and fourth element ought to also apply to the first element? Yes. And we rely upon, as we indicated earlier, with respect to why we think that the Sam's decision is correct, as it goes, the fact that the language of the prejudicial error statute in the VA context is identical to that in the APA context. And as it was intended to be, as Congress articulated in the Senate report that we cite to in our briefs, and as we also note that we presume Congress understood how that statute was applied when citing to it, and indeed citing to the very case in which the burden is placed upon the party challenging the error, the Ninth Circuit Sam case. And we believe that that is what must direct this Court's decision in this case with respect to its review of the Mayfield decision. We don't find the Mayfield attempt to distinguish the facts of the notice issue in this case from what would be the normal situation involving the application of the error, the burden upon the party challenging the error, to be sufficient. They point to the Kodiakis case, which is a criminal case involving special situations, the first of which, of course, is criminal, as is O'Neill's quasi-criminal Habeas case. Secondly, the nature of the errors in those cases are very much different. I think what we have to understand, and you've heard argument already, and I expect again, about the unique nature of the VA claims development process, but we think that the very nature of that system requires placement of a burden, in this case, upon the claimant. The system has multiple opportunities built into it for communication. We don't deny that these cases involve an error on the part of the VA with respect to one of those opportunities. The fact that the system has so many opportunities required by regulation and statute in which the VA must communicate its thinking, its rationale, its basis of decisions, the evidentiary support behind those decisions, which more than establishes the reason for the VA's decisions in those instances where it denies a claim, that the notice that is at issue in this case is provided at some point in the VA appellate process. If it doesn't get provided at the outset, it does get provided, and so the question really comes down to, well, in this case, the technical finding is you didn't provide notice pursuant to 5103, subsection A. Well, yes, because this case... I guess I'm having a hard time getting that. My understanding is no matter under the government's burden, where the government can get off the hook, the government, the Mayfield decision, puts the burden on the government, and the government can always win if it says that any defect in the notice was cured by actual knowledge on the part of the appellant that certain evidence was required. So what's the problem for the government? They can always avoid this under any of the tests because they can always come in and say that's so. So why is that a problem? The fact that the test applied contains a sort of potential to rebut a presumption does not mean that it's correctly interpreted pursuant to the statute that requires the VA court to follow this test. What we're suggesting is, yeah, we understand that we have an opportunity to rebut the presumption. So if that's so, the case is going to be fine. And if that's so, then the government ought to be able to prove it. You stated hypothetically where the veteran is always going to at some point get all the information they need because the system always helps them along the way. Well, if that's so, then there ought not to be any problem for the government. No. I mean, with all due respect, Your Honor, we think that the issue shouldn't be looked at through the prism of, well, will the government get a chance to make its case? I mean, we're simply talking about the application of a burden in this case. And we believe that the statute requires the application be placed upon the claimant trying to seek relief from the heir. So I think that's our legal position. And so we would suggest strongly to the court that, you know, the fact that there may be written into the Mayfield language a potential to rebut doesn't address the question that we've raised here, which is what does the statute require? Here's what I have a hard time getting to, so maybe you can help me. On the tests for second, third, and fourth elements that you want to apply across the board, I get the first part, which says that the claimant has to come in and say they would have done something. But the second test, which is the claimant has to show the lack of notice affected the essential fairness of the adjudication, how on earth is someone supposed to know how they're supposed to do that? What does that mean? Well, I think that actually that— If they have the burden to prove it affected the essential fairness of the adjudication, what does that mean? I mean, as I asked you before, is the government saying they have to show that if they had gotten the exam, it would have proved that they would have won the case? That would be an example, as counsel indicated from the other argument. Yeah, but he also said in his reading, and I think his reading of Mayfield is correct, that it doesn't necessarily require— Indeed, I believe the Mayfield court does say that. And I think they focused on— So what are they supposed to show? The problem I have is not so much whether there's a test or not. It's just when the test is almost insurmountable because it's unclear. I mean, I don't understand how most appellants would know then what they're supposed to come in and prove up. They can understand the first part, but I don't understand how they're supposed to understand what's necessary to show that it affected the essential fairness of the adjudication. I think that the answer to the first part is sort of along the lines of the answer to the second part. And I also—and I'll try to explain that more fully. But I also think that we have to recognize the context of the issue. It's going to come up from an appeal of a board decision in which they now know why, and had known, frankly, back from when the regional office initially denied the claim, why their claim was unsuccessful. By statute number 5104 and 7105, VA is supposed to inform the individual why their claim was unsuccessful. Based upon that knowledge, and based upon—well, based upon that knowledge, frankly, the plaintiff appellant is going to know what was insufficient about it. Is there a case? And they compare that to the notice that they received throughout the case. And so, for example, Your Honor, in your situation in which the issue hypothetically is a lack of a medical opinion connecting an in-service event or injury with a present-day disability, and the notice—they never received notice that they needed to get that. And then they get a final decision, and it says, you never established that—this connection. And the veteran appellant says, well, wait a minute. Yes, I have this. I have this document all the time. You never asked me for it. And that situation is very simple, I think, for the—and I think that's kind of the theme of these situations, is given the context and all the information available to the claimant appellant at the time, they would be raising this challenge. They should know how they were affected, how they did not have an opportunity to fully participate in the development of their claim. Well, what about if they never get a notice, and the notice would have said, well, we need further medical evidence with regard to the hearing loss? So they come in and they say, if I had gotten this notice, I would have gone to a doctor and gotten that evidence. Is that sufficient to affect the essential fairness of the adjudication, or do they have to go in and say, and then this doctor would have said this and proven this, blah, blah, blah? I think—well, I don't know if the Mayfield case—and I don't need the Mayfield case to provide anecdotal or hypothetical examples of what would be required, but I do think that with the burden placed properly on the claimant appellant, the Veterans Court would look at the record and determine whether they have basically raised a colorable presumption that they were somehow deprived. And for example, in this case, in which after the—in this case, you have a situation, it's actually very—you have a situation in which the claim that's really at issue here is a claim for an increased rating. Ms. Simmons had already been service-connected for her left ear disability. So she knew—she was not satisfied with the rating that she had at the time. It wasn't providing her with enough benefits that she thought were required. So she came in and submitted a claim to try to increase their rating. The very nature of this claim presupposes an element of knowledge as to what it is that you need to do to establish a higher rating. Well, you need to establish that your present disability has gotten worse. And facts show clearly in this case that subsequent to her filing the claim, Ms. Simmons not only provided a privately obtained medical opinion designed to show that very thing, but received four more by the VA over the course of the claim's development. So we believe that by properly placing the burden on the veteran, claiming to explain how, after having five separate audiological exams with respect to whether or not your hearing has gotten worse, you were prejudiced by a technical failure initially noticing you needed to provide evidence of how your condition has gotten worse. The statute, we think, requires the burden to be placed upon the veteran claiming. We think that had that happened, these kinds of cases, even if the Secretary has an opportunity to come back and make this very argument, these kinds of cases are not going to be shuffled back to the system in which it's clear that the VA has done a lot in this case to develop. And I'm not sure—I don't believe any of the members of this panel were on the old PBA decision which discussed regulations implementing the BCAA. But one of the issues really raised when the BCAA came out from the claimant community was with respect to examinations. There was a suggestion that the claimant community wanted to have automatic examinations in every case, and, of course, that could create all kinds of issues. Well, in these cases, in a lot of these cases, Judge Newman, that are pending before this court, we've had examinations, multiple examinations, provided by the VA. Unfortunately, and it's going to happen from time to time, but unfortunately, these examinations haven't demonstrated a right to receive benefits. And we believe that if the burdens are properly placed on these kinds of cases, then finality will finally be issued. And I will say one last thing, Your Honors, that even when a final decision comes down, and, for example, in this case where a present disability is determined not to be sufficient to merit a certain level of benefits, if it gets worse, of course, under the statute, 5108, the veteran claimant can always come back and submit a new immaterial evidence claim, seeking benefits at that time based upon the higher level of injury or disease, or disability, I should say. So these cases are not without future relief, especially a case like this in which the issue is, what was the rating of present disability? And after five exams, it wasn't sufficient. We think that by placing the burden, as Congress intended, on the appellant, that the system will work that much better, and those with certainly valid claims will have their opportunity to go forward. Thank you. Thank you, Mr. Wright. Mr. James. Thank you. Let me introduce, please, my colleague, Sean Raymond, who is appearing for the first time today. The VA's position, as most recently stated, is trust us, we'll take care of it. The VA says, along the process of developing claims, we are supposed to routinely inform the claimant what the claimant needs, even without regard to the existence of the BCAA, under the regulations that existed before the BCAA and now. And then if we don't give the claimant what it is that the claimant asked for, we'll explain why we didn't in a statement of the case, statutory document, existed before the BCAA and still exists now. But you see, the problem is that Ms. Simmons would like to have her case decided on the facts of her case, which I think are more in conformity with the reality out there in VA regional office practice. What Ms. Simmons needed while she was floundering around down in North Carolina was for somebody to take out 38 CFR 4.85 and the three associated tables and explain to her that she wasn't going to get anywhere with moderate hearing loss in the left ear and no service connection for the right ear. What she needed was for somebody to say to her, here's how you might go about establishing that your right ear hearing loss is service connected. And had that happened, we might have gotten to the place where the board itself got joint appendix page 20, where there are two tables that show her hearing state when she enlisted and one which shows her hearing state when she was discharged from the Navy. And those two tables examined together showed that, yes, indeed, the Navy audiologist did record a hearing loss at discharge. Mr. James Cronin. Yes, ma'am. The argument you're making, which is pretty compelling, my question is, even if Mr. Hockey would prevail as I understand it, that would mean your client would have the burden, some sort of burden at the threshold. And it seems to me the kind of argument you're making here would be sufficient, arguably, to satisfy that burden. In other words, what's the big deal? What is the problem with requiring that burden? You've just given us probably, maybe, I mean I can't, you know, the kinds of information that presumably would be enough to satisfy that burden. So how would it be prejudicial and problematic for your client to just require that burden on the other elements of pay care? Thank you. The difference is that at the time all of this counts, when the claimant is down at the regional office trying to get a benefit available to her, she's not represented. There's legislation, I have to tell you, which would change that in June, but it doesn't affect Ms. Simmons' situation. Down at the regional office she has no champion except the veteran service organizations and most of their personnel, partly. And you can see it in this case where the veteran service organization representative even referred to her as him. And the best theory that they could come up with together was this idea of secondary hearing loss in the right ear caused by the sprain on her left ear overworking. Well, you know, it was in the record, as I pointed out all along, the people who are helping veterans in North Carolina with their claim are not lawyers. They're ordinary people doing the best they can under bad circumstances, and they're not doing good enough. And the VA, when it looks at a claim like this, gets stuck on the first adjudication and says to itself, well, we have a signed service connection for the left ear hearing loss, so all we've got to do is send her for five audiological examinations to see what the state of the hearing loss is now. Well, that wasn't the solution that she needed. The solution that she needed, according to those three tables of 4.85, was to get the right ear involved. Now, let me go give St. Dixit, if you'll be patient, in order to show you what's wrong with this system. This lady has now had, since the record was closed, two surgeries in each ear. After brief improvement, I'm told the left ear is now effectively, per word, dead. That's the ear that the service connected. So with that, she gets a large Roman numeral for one ear. Now, of course, she has diminished hearing in the right ear, and she goes back now sometime in the future with Mr. Raven's help as a lawyer who can compile evidence, and she says, give me at least a moderate Roman numeral for the other ear. You look at the chart, you get the intersection, and boom, she's got 40% to 80% hearing. So who was supposed to tell her this all along in this veterans-friendly system? Who was supposed to ask a medical doctor, what is the relationship between straining the ear in the left ear and loss in the right ear? Is there one? Instead, we've relied on one audiologist after another, which is like taking a snapshot and finding out in a moment in time what the disability is this instant. What we needed to know was, was that right ear loss ever attributable to something on active duty? And the answer is, it sure looks like it now that somebody has finally looked in at heart. And this isn't going away. You referred, Matt, 100 cases or more. When I counted the cases in Mr. Hockey's disclosure, in this case, I came up with 161, I think. And that was six months ago. If there aren't more now, I'll be greatly surprised that I can give you the names of some leaders that are already coming back to you. Danis is here again. Overton will be here for the first time. It's my impression that Mayfield is either here again or it's coming. But is it your view that because of the PCAMA, there was this initial interim, either confusion or whatever, that led to the fact that there's all of these cases and that somehow this will dissipate in the future now that the system seems to be in place and the notices are all formalized and so forth? No, it's not going away. I don't think entirely. You don't think that necessarily there was an initial sort of period in terms of adjustment and retroactivity and so forth that comes for a certain number of increased numbers? It can't go away until the VA learns how to do what it was never compelled to do before, and that is sit down and talk to the vet and tell the vet, here's what you need to prevail in your claim. It can't improve until the VA learns that. It has looked to me as if this VCA struggle has been the veterans court trying to make the board do it right, trying to make the board, make the regional office do it right. But that has been unsuccessful in the viewpoint of the VA, and so now six and a half years later the VA is on your doorstep in these two legal cases saying to you, we need an excuse slip. We can't get it done right with what we've got, so we need for you to pat us on the head and tell us that if the veteran doesn't dance through the prejudicial error, the veteran doesn't get any better. That's a pretty sorry state. Mrs. Simmons's position is, nothing cited in the government's brief requires any outcome. The VA has not established, as it often says with veterans, has not established an error. When you look through the decisions for yourself, as we're sure you will, you'll find that the significant lesson from the decisions is that there is tremendous, unexpected diversity out there about this rule, and in fact it turns out that there's not just one rule, but there are numerous different statements of a kind of rule, all of which converge at one point. Somebody has to say something. Well, the veterans court looked at the situation, scratched its head hard, and did as the VA suggests to you today. It opened up cases decided under 5 U.S.C. 706, the APA test, which is, as they say, identically worded. And when they looked at those cases, it found Braniff, it found Bushman, it found U.S. Steele, McClouth, and when it read those cases, the VA disagrees, when it read those cases, it found a license to do it differently under different circumstances. And so having been told by this court plainly in Conway, you must take into account it scratched its head in one of Judge Steinway's wonderfully instructive decisions and said, well, if we've got to do it, then we probably need a structure. It looked at the precedent as best it could, and it came up with a structure. You know, it probably could have done that under its rule-making authority, and it believed that it had extensive discretion because, of course, there's no precedent on this point, except now, later, your case, your decision, in Mayfield, which was decided under the grounds. For the VA to argue to you today that the Veterans Court committed legal error in this situation pushes the boundary. What the VA really wishes to sell you today is its view of what would be jurisprudentially a better rule. And as a litigant, the VA is here to ask for the version of the rule that it believes that it would most enjoy. There is no representative for a community of veterans here today, just the people who represent one veteran at the time. My client has not authorized me to speak at large on what veterans would prefer. She has a claim. She has two new theories. She has a change in circumstances, and she has a remand from the court below, and all she wants me to do is to get this case out of court so that she can go back now informed and represented and try to do what she could have done earlier if only the VA had done its job and explained to her what she needed to do to sustain a claim for increase. Here it was, under 38 U.S.C., 4.85. But then when the VA comes to you, it argues decisions reached under 28 U.S.C., 2111, your statute, as if they apply in lieu of 38 U.S.C., 7621 below, and then does not do much in the way of explaining to you what's the big deal if the VA loses here today. The best the VA did to satisfy your prejudicial error test, which is outcome determinative under Cunningham, was to say to you, well, geez, if we lose here today, then we'll have to explain to Ms. Simmons what it is she needs to prevail on a claim for increased compensation for hearing loss. And then we're going to have to wait a year while she goes out and looks for that evidence and brings it back in to us. So our pitch to you is that this case does not satisfy your test for prejudicial error. And as to the test developed by the court below, we say the court below did exactly what you told it to do in Conway. It took due account in the Simmons opinion, which is, what, about nine pages long, I think. It pulled in the logic from Mayfield 1, as we call it, the original Mayfield. And may I please inform you that that logic has been adopted by the Veterans Court again after Mayfield 2 in a decision called Overton. So it's going to keep coming back over and over to this court. Having been instructed to take due account, it built a structure for doing that job that must ramble on for 20 or 30 minutes, pages, excuse me. And I see that the questioning has stopped, and I realize I'm rambling on now. The point is they did what you told them to do. They had the authority to do it, and not one decision cited by the government says it was legal error to do that. If you have no more questions for me, I'll sit down and say a few things. Thank you, Mr. James. Thank you, Mr. James. Thank you, Your Honor. Two points. We do cite this court's decision in Ricardo which interprets the APA standard. We do cite the legislative history and language of the statute in support of placing the burden upon the claimant. And we think that that is more than sufficient for this court to find under its own precedent and that of those cases interpreting the APA that Congress, in this case, intended for the extent to which we're going to place a little burden as part of its prejudicial error requirement to be placed on the parties seeking to overturn the error. We've also explained how we think, contrary to Ms. Simmons and Mr. Sanders, that the system in place is actually geared specifically for the type of analysis that should take place here. There are records that show exactly what was provided, what wasn't provided. Numerous communications. It's very different from the situation, say, in a criminal context in Codiacus, in which a piece of evidence is excluded in a criminal trial and there may not be an opportunity afterwards to have any kind of further communications. This process is sort of built to foster the communication at every level. There are errors from time to time. And when there are errors, there should be a requirement on the claimant to identify how that claimant's participation in the process was deprived as a result of that error. And I just want to say, finally, that I'm a little in disagreement with respect to the characterization of the case here, Ms. Simmons' case, especially with the references to the right ear. I mean, as the court knows from reviewing the record and reading the decision below, at the time Ms. Simmons came in, which was after she initially filed a claim for a left ear increase, and complained that she had a right ear issue, I think the record pretty plainly shows that the VA reacted to that by suggesting that she come in and receive audiological exams for her right ear. Unfortunately, as the court below found in this case, they misaddressed the requests for those examinations because in the interim, Ms. Simmons had relocated. And when they found that out, that issue was remanded. That's a portion of the case you're not appealing. No. That's a portion of the case that nobody's appealing. The development of the right ear came about as a result of Ms. Simmons informing the VA that she had problems listening in her right ear. And VA's reaction was not to ignore that or to not show her something in a rating schedule. It was to say, come on in and have rating exams. And when it became clear that the reason she didn't come in was because they misaddressed the rating exams, the court corrected that mistake. And she's, I assume, I presume, counsel would know better, has had access to those rating exams for that right ear. So that issue isn't even part of this discussion today. We're focusing on the fact of related to the increased rating of the left ear. Okay. Thank you. Thank you, Mr. Atkins. Mr. Jones, please. This has been an interesting issue.